# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 20, 2016 Session

## STATE OF TENNESSEE v. TROY LOVE

**Appeal from the Criminal Court for Knox County**
**No. 101879    Steven Wayne Sword, Judge**

———————————

**No. E2015-02297-CCA-R3-CD – Filed March 21, 2017**

———————————

The Defendant, Troy Love, was found guilty by a Knox County Criminal Court jury of two counts of rape of a child, a Class A felony, and of aggravated sexual battery, a Class B felony. *See* T.C.A. §§ 39-13-522 (2014) (rape of a child), 39-13-504 (2014) (aggravated sexual battery). He was sentenced to consecutive terms of twenty-five years each for the rape of a child convictions and to a concurrent term of ten years for aggravated sexual battery, for an effective sentence of fifty years to be served as a Violent Offender.  On appeal, the Defendant contends that (1) the trial court erred in denying his motion to suppress his pretrial statement, (2) the court erred in denying the Defendant's pretrial motions relative to interaction between the victim and State agents and for a "taint hearing" to determine the victim's reliability, (3) the court erred in failing to conduct a pretrial hearing to corroborate the reliability of the Defendant's pretrial statements, (4) the court erred in denying the motion for a directed verdict and for judgment of acquittal, (5) the evidence is insufficient to support the convictions, (6) the court and the prosecutor improperly referred to "Count 8" despite the fact that only three counts were submitted to the jury, (7) the court erred in its jury instructions, (8) the sentence is improper, and (9) due process requires relief due to the existence of cumulative error.  We affirm the rape of a child convictions, and we reverse the aggravated sexual battery conviction and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Megan A. Swain (on appeal) and Chloe Atkin Akers (at trial), Knoxville, Tennessee, for the appellant, Troy Love.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Charme Allen, District Attorney General; Christopher "Kit" Rodgers and Ashley McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to sexual abuse of his step-great-granddaughter. At the trial, the victim, who was nine years old at the time of the trial, testified that she knew the difference between a good touch, such as a hug, and a bad touch, which she described as "someone's touching you in a part you don't like." She said bad touches had occurred when the Defendant touched her "private parts" and her "butt" with his fingers and his mouth. Using a diagram of a female and a male child, she identified the areas corresponding to the "private" and "butt." She said the touching began when she was six years old and continued until she was eight. She said it occurred in the Defendant's living room and bedroom.

Relative to an incident in the Defendant's bedroom, the victim testified that as she watched television, the Defendant came into the room, went under the sheets, and touched her "private" with his mouth. She said the Defendant's actions made her sad.

Relative to an incident in the Defendant's living room, the victim testified that as she napped on the couch, the Defendant came to the couch where she was sitting, that she moved to the end of the couch, and that the Defendant touched her private with his finger and his mouth. She thought she was in second grade when this incident occurred.

Relative to an incident in the movie room at her old house, the victim testified that she sat on the couch, wore "footsies," and watched a movie. She said the Defendant unzipped her clothing and touched her private with his finger. She said his finger did not go inside her.

When asked whether the Defendant touched her privates on any other occasions, the victim said he did not. She said the Defendant never put anything, including his finger or his private, in her private. She likewise stated that she could not recall any other incidents in which he touched her body with other parts of his body.

The victim testified that the Defendant's wife had passed away, that she had spent a lot of time with the Defendant and his wife, and that she visited frequently at their house. She said she called the Defendant "Troy."

The victim testified that when she was in second grade, her mother and her grandmother took her to a place with a Wii gaming system and that she talked to a woman and made drawings with her. She said she told the truth to the woman and did

not tell her anything that was not true. She said her mother and grandmother were not in the room when the woman talked to her. She recalled the woman's stating that video cameras were recording what happened. She agreed she told the woman that her "grandpa" had touched her in places she did not like. She agreed she told the woman the incidents began after the Friday on which the victim had her tonsils removed. She agreed that the incident she described in the Defendant's bedroom occurred on the Sunday after her tonsils were removed and that she had told the woman who interviewed her that she had asked to go to the Defendant's house that day. She agreed she had told the woman that she went home on Monday and told her mother on Tuesday about the touching. She agreed that the woman drew a timeline based on the interview, and the timeline was received as an exhibit.

The victim testified that she did not remember the woman asking her if the Defendant ever put his private in her private. After reviewing a portion of the video recording outside the presence of the jury, the victim testified that watching a video recording had helped her remember what she said. She said she told the woman the Defendant had put his private in her private. She did not recall if the woman asked how the victim's body felt when the Defendant did this, but she later said she remembered telling the woman her body felt tingly after the Defendant put his private in her private. She remembered telling the woman that the Defendant lay on top of her when he put his private in her private. She recalled telling the woman that the Defendant did not have to do anything to his private part before putting it inside her and that it was inside her, not just close to her private part. She remembered telling the woman that she was five years old the first time the Defendant put his private part in her private part. She recalled telling the woman that the Defendant put his private part in hers seven or eight times and that she never saw the Defendant's private part. The victim recalled telling the woman that she did not remember how the Defendant's private part felt.

The victim identified a drawing she made for the woman who interviewed her, and it was received as an exhibit. She recalled telling the woman that the drawing showed "where the pee comes out of." She recalled telling the woman that when she went to the bathroom "that night," she saw something that looked like "boogers" in the part of her underwear that "went under her private."

The victim acknowledged that she had testified that the Defendant did not put his finger in her private. She remembered telling the woman who interviewed her that the Defendant had put his finger in her private, and she recalled showing the woman what the Defendant did with his finger but did not recall what she had done.

The victim testified that she had her tonsils removed when she was seven and one-half years old and that she told her mother about the abuse after she had her tonsils removed. She said she told "Jessica" about the abuse before she told her mother. She did

not recall what she told the woman who interviewed her when the woman asked why the victim told Jessica about the abuse.

The victim acknowledged her previous testimony that she did not remember what she told the woman who interviewed her about what the Defendant did with his finger inside the victim and said that watching the video recording had not helped her remember. A portion of the recording was played for the jury, and the court noted that it pertained to "this question that [the prosecutor] just asked [the victim]." The court instructed the jury that its consideration of the recording was limited to matters concerning the victim's credibility and was not to be considered as substantive evidence.

The victim testified that after viewing the recording, she recalled why she decided to tell Jessica about the abuse. The victim said she told the woman who interviewed her that she told Jessica because it was something important. The victim acknowledged that in the recording, she told the woman that she and Jessica had talked about their favorite people and that the victim had said her "uncle" was her favorite person because he had touched her "in the bad spots." The victim testified that no one other than the Defendant had touched her in "private spots."

Knox County Sheriff's Detective Miranda Spangler testified that she spoke by telephone with the victim's mother on January 14, 2013. She said she met with the victim's mother and the victim's grandmother and conducted a brief interview of the victim's mother. Detective Spangler said she asked the victim's mother to participate in a "one-party-consent call" with the Defendant, which Detective Spangler said involved a person making a telephone call with a detective guiding what the person said. Detective Spangler said the person who made the call would know that the call was being recorded but the recipient would not.

Detective Spangler testified that the victim's mother made multiple one-party-consent calls to the Defendant. Detective Spangler said that because the victim's mother had blocked the Defendant's telephone number on the victim's mother's cell phone, the victim's mother used the victim's grandmother's cell phone to make the calls. Detective Spangler said the Defendant initially answered calls but eventually stopped answering.

Detective Spangler agreed that a friend or family member, rather than a police officer, was used for one-party-consent calls because the call's recipient might be more willing to talk to the person making the call. Detective Spangler agreed that she gave the victim's mother some instructions about what to say. She said that she listened to what suspects said in one-party-consent calls and that she sometimes advised callers about what to say in order to keep the suspects talking. She agreed that she told the victim's mother to tell the Defendant he owed it to her to talk about what happened with the victim.

-4-

The January 14, 2013 recording of the calls was played for the jury and reflects the following: A call was placed, and a message was received stating that the caller was not authorized to call the number. In the second call, the victim's mother identified herself to the Defendant and asked why he "did this" to the victim. The Defendant's response is unintelligible. The victim's mother stated she wanted to know what he did to the victim, and the Defendant responded that he could not talk about it now. The victim's mother stated that he had no choice. The victim's mother stated that the Defendant hung up. In a third call, the victim's mother told the Defendant that he owed it to the victim's mother and the victim to tell the victim's mother why he had done "this." She stated that the Defendant hung up again. In a fourth call, the victim's mother told the Defendant to quit hanging up and stated he had to talk to her about "this." She stated he owed it to her and her daughter, who had loved and trusted him. The Defendant stated, "I know, honey. I didn't mean to do it." He said, "I gave in, and I shouldn't have." The Defendant stated that he was depressed, that he did not know why he did it, that it was horrible, and that he wished he were dead. The victim's mother stated that the victim said the Defendant "put something in her" and asked what he put in the victim. The Defendant repeated, "that I put something in her." The victim's mother asked what he did and then stated that the Defendant hung up. Fifth and sixth calls were placed, and a voicemail message began playing in both. Following discussion about making a call from a different telephone number, a seventh call was placed, which reached a voicemail recording. Between the calls, the victim's mother talked to Detective Spangler and Travis Bishop, an employee of the Department of Children's Services, about how the victim's mother should proceed in speaking to the Defendant.

Detective Spangler testified that on January 14, 2013, a forensic interview of the victim occurred at Child Help. Detective Spangler said that they located the Defendant because the victim's mother, who paid for the Defendant's cell phone service, placed a tracking device on his cell phone. Detective Spangler said she, Detective Faulkner, and Mr. Bishop followed the Defendant from a business to the Defendant's home with information from the tracking device.

A voicemail message that the Defendant left for Detective Spangler on January 22, 2013 was played. In it, the Defendant stated that he was calling Detective Spangler in response to her questions about allegations of sexual abuse of the victim. He stated that he was impotent and unable to have sex and that he had been unable to have sex with his wife before her death. He stated that he had "issues" with the victim and that she had a history of lying. He stated that the victim had told him she had sex with two boys but that she would not tell him the boys' names. He stated that the victim had "issues" with "sexual things" and "honesty and telling the truth." He said the victim told him that she had seen her father and stepmother engaged in sexual activity. He said the victim had stolen $120 from his wallet, which was inside a drawer.

Detective Spangler testified that after she received this voice mail message, she gathered her information and gave it to the district attorney's office. She said that after the grand jury returned an indictment, she checked with the victim's mother about the cell phone tracking information relative to the Defendant's location and that he was arrested in Battle Creek, Michigan based on that information. She acknowledged that the victim's grandmother had told her previously that the Defendant was from Michigan, had family there, and would go there if he left Tennessee.

Detective Spangler agreed that after the forensic interview, she had the victim's grandmother attempt to make a one-way-consent call but that the Defendant did not answer. Detective Spangler agreed that she made arrangements for the victim's grandmother to make another one-way-consent call later that day, although she ultimately told the victim's grandmother not to make the call after receiving advice from the prosecutor. Detective Spangler agreed that on the morning of January 14, 2013, the victim's grandmother told her that the Defendant left a voice mail message in which he said he wanted to talk to the victim's grandmother about something important.

Relative to the victim's forensic interview at Child Help, Detective Spangler testified that in a forensic interview, a child was alone with a trained interviewer who was not biased and did not ask leading questions. She said she and Mr. Bishop watched the interview. She agreed that the victim first made allegations against the Defendant on January 8, 2013, and that the forensic interview occurred on January 13. She agreed that after watching the forensic interview, she and Mr. Bishop talked to the victim's mother and the victim's grandmother to see if the victim's account could be corroborated and noted that children are not good with "their times, their timeline."

The victim's grandmother testified that the Defendant was her stepfather and that her mother had passed away from hip replacement complications in 2012.

The victim's grandmother testified that the Defendant's abuse of the victim came to light on January 8, 2013, when the victim told her babysitter, Jessica, about it. The victim's grandmother said the babysitter notified the victim's mother, who notified the victim's grandmother. The victim's grandmother said she called the Defendant on the day the victim revealed the abuse and asked him about the allegations, but he said he was at work and could not talk. She said that she received a voicemail message to call the Defendant and that they talked. She said he left messages for her on January 8 and January 14.

A voicemail message that the Defendant left for the victim's grandmother on January 8, 2013 was played. In it, the Defendant stated that he wanted to talk to her about what she called about earlier that day. The Defendant stated that he had not wanted to talk around others earlier and that he did not have sex with the victim "or anything like

-6-

that." He stated that the victim "makes up stories" and that she had told him she had had boyfriends and had sex but that he had not believed her. He said he had asked the victim to identify her boyfriends but that she did not. He said he thought the victim exaggerated things. He said he and the victim wrestled but did not do anything sexual.

The victim's grandmother testified that she called the Defendant after she received the preceding voicemail message and asked what was going on and why the victim made the allegations. She said he stated that he did not know, that he had been depressed, that he was sorry, and that if the victim's family did not notify the police, he would leave town and they would never see him again. She said the Defendant stated that he could not go to jail and would rather die. She said the Defendant put his house on the market and left town within three weeks to one month. She agreed that she told Detective Spangler she had the ability to see the Defendant's cell phone records because she paid for his service and thought she told Detective Spangler that she had not seen any calls from the Defendant to his relatives in Michigan between January 8 and January 14, 2013. After reviewing a recording outside the presence of the jury, the victim's grandmother agreed that at Detective Spangler's direction on January 14, she attempted to make a one-party-consent call to the Defendant after the calls placed by the victim's mother.

The victim's grandmother agreed that the victim's tonsils were removed around the time the victim first made the allegations on January 8, 2013. The victim's grandmother agreed that the victim was emotional. The victim's grandmother agreed that she told Detective Spangler and Mr. Bishop that the victim had not seemed like anything was wrong immediately after the last time the victim spent the night at the Defendant's house. The victim's grandmother thought it was unusual that the Defendant dropped off the victim without checking to see if the victim's grandmother was home but acknowledged she did not know if her son, who lived with her, had been home. She said her husband had been at work on this occasion. After reviewing a recording outside the presence of the jury, the victim's grandmother agreed that the last time the victim spent the night at the Defendant's house was "right when they got out for Christmas break." When asked whether it could have been on Christmas Eve, the victim's grandmother could not recall the date but stated it would not have been unusual for the victim to have spent the night away from home on Christmas Eve because the family was of the Jehovah's Witness faith and did not celebrate Christmas. The victim's grandmother agreed that she did not know every time the victim spent the night at the Defendant's house.

The victim's grandmother testified that her sister was married, that the Defendant lived with the sister, and that the victim sometimes spent the night at the sister's house. The victim's grandmother said the victim had never stated that anyone other than the Defendant touched her inappropriately.

At the close of the State's proof, the trial court granted a motion for judgment of acquittal for counts three and four of the indictment, which alleged rape of a child by vaginal/oral penetration and vaginal/digital penetration, respectively. The remaining counts for the jury's consideration consisted of counts one and two, each alleging rape of a child by vaginal/oral penetration, related to an act at the Defendant's house on his bed and to an act on the couch in the Defendant's living room, respectively, and count eight, alleging aggravated sexual battery by vaginal/digital contact, related to an act in the movie room of the victim's old house.

The victim's mother testified as a defense witness that the victim never told her "completely" about the allegations. The victim's mother said the victim had not had any contact with the Defendant since making the allegations.

The victim's mother testified that the victim's tonsils were removed on January 4, 2013. The victim's mother said that following the surgery, the victim stayed primarily with the victim's mother and "Jessica." She said the victim did not stay with the Defendant after the victim's tonsils were removed. The victim's mother said the victim never stated that anyone other than the Defendant touched the victim.

The victim's mother testified that she did not know of a time when the victim suddenly had $120 in cash. When asked if she would know if the victim had $120, the victim's mother said she would not.

The Defendant testified that he did not commit the acts to which the victim testified. He denied putting anything inside the victim. He denied touching her inappropriately. The Defendant stated that he, his wife, and his two stepdaughters moved from Michigan to Tennessee in 1980. He said that he lived in Knoxville for thirty-three years, until 2013, during which time he worked as a housepainter. He said that, aside from the present charges, he had never been arrested, convicted of a crime, or accused of anything similar.

The Defendant testified that his wife died on June 5, 2012, from hip surgery complications. He said that they had been married for thirty-three years, that her death was unexpected, that he was depressed afterward, and that it took him a long time to get over her death. He said he had financial difficulty after her death, that he had to sell his car, and that he was facing foreclosure of his home mortgage. He said he had been unable to find work in Knoxville.

The Defendant testified that he had been impotent since shortly before his wife's death. He said he did not seek medical treatment because he had been busy taking care of her and trying to make a living. He said he did not seek treatment after her death because

he was depressed and "wasn't worried about that kind of thing." He said he was not thinking about having sex with anyone at that time.

The Defendant testified that the victim grew up with him as her great-grandfather, that they were close, and that he had taken her and her brother fishing. He said she last stayed overnight at his house in December 2012. He said that it was not unusual for the victim to spend the night at his house and that the victim and her brother stayed there. Relative to the victim's last overnight visit, he said that he slept in his bed upstairs and that she slept downstairs on the couch. He said that the victim never came into his bedroom that night, that they would have watched television or movies in the living room, and that he never "went downstairs to the couch" that night. He denied putting his mouth on her vagina that night. He said that the next day, he took her to visit her cousins and then took her to her grandmother's house. He said he "took her up to the house" and would not have left her if no one had been home, but he did not recall who had been home.

The Defendant recalled that he received a telephone call from the victim's grandmother on January 8, 2013, regarding allegations the victim made against him. He said he had been at work and unable to talk about personal matters and that he returned her call later. He said he denied the allegations in a voice message he left for the victim's grandmother "[b]ecause it didn't happen." He did not recall having a January 14 conversation with the victim's grandmother in which he said he would rather die than go to jail. He said that he received six or seven "harassing-type" calls on January 14, in which the unidentified callers wanted him to admit wrongdoing. He said he was angry and kept hanging up. The Defendant denied that he called the victim's mother and "basically admitted" the victim's allegations and that he said he would "disappear." He denied saying he would rather be dead than incarcerated and said the victim and the victim's mother lied in their testimony when they said otherwise.

The Defendant addressed the January 14, 2013 telephone call, a recording of which was played during the State's case-in-chief. Regarding his statements in the call that he did not mean to do it, that he gave in, and that he should not have given in, he said he meant it as an apology for not having told the victim's mother about the victim's having said to him that she had sex with two boyfriends. He said the victim also stated she had seen her mother and stepfather having sex. He said that he had not told the victim's mother because he had not believed the victim and stated that the victim was "having issues" and had stolen $120 from his wallet. He said he regretted not telling the victim's mother about what the victim had said because if he had told her, she "maybe . . . wouldn't have been telling lies about" him. When asked if his statements were in reference to having touched the victim or put his mouth on her vagina, he responded, "Of course not." He said he had stated he wished he were dead because everything in his life was going wrong. He noted his wife's death, his financial problems, his unemployment, the victim's accusations, and his family's disowning him. He said he felt like his "life

-9-

was a hell." He said he had not wished he was dead because he had put his mouth on the victim's vagina or touched her inappropriately. The Defendant acknowledged, however, that his response about not having meant to do it, having given in, and that he should not have given in had been in response to the victim's mother's question asking why he had "done this" to the victim. He acknowledged his apology had been vague. He also acknowledged that he knew the victim had made sexual allegations against him when he said it. He did not recall stating in the telephone calls that he was weak but agreed that if the recording reflected he had said it, he did.

The Defendant testified that he did not have anywhere to stay in Knoxville in February 2013 and that none of his family in Knoxville was speaking to him. He said he went to Michigan to be with family, have a place to stay, and look for work. He said that in Michigan, he was able to stay with his brother and that he found work. He said he leased his Knoxville house to someone who was eventually able to obtain a mortgage and purchase it.

The Defendant agreed that he had raised the victim's grandmother, who was his stepdaughter, and that they were close and trusted each other at the time the victim made the allegations.

After receiving the proof, the jury found the Defendant guilty of rape of a child for the vaginal/oral penetration occurring at the Defendant's house on his bed, guilty of rape of a child for the vaginal/oral penetration occurring on the couch in the Defendant's living room, and guilty of aggravated sexual battery for the vaginal/digital contact related to an act in the movie room of the victim's old house. After the Defendant was sentenced to serve an effective fifty years, this appeal followed.

# I

## Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress evidence of the recorded telephone calls between the Defendant and the victim's mother. He characterizes his statements in these calls as statements to law enforcement because they occurred under Detective Spangler's direction of the victim's mother and had the effect of harassing him and overbearing his will. The State contends that the Defendant failed to establish that his will was overborne and that the trial court correctly denied the motion to suppress. We agree with the State.

The trial court conducted a pretrial hearing on the Defendant's motion to suppress evidence of the calls. At the hearing, Detective Spangler's testimony was consistent with her trial testimony regarding the circumstances surrounding the calls. Generally, she

arranged for the victim's mother to make the calls in Detective Spangler's office in the presence of Detective Spangler and Mr. Bishop. She said the victim's grandmother was also present. The recording of the calls was received as evidence. Detective Spangler said she instructed the victim's mother about what she should say in the calls. The detective recalled that before the first and third calls, she told the victim's mother to say the Defendant "owed it to" the victim's mother to tell her what happened with the victim. Detective Spangler stated that she told the victim's mother to "just let him talk to find out what's going on" and what he had done to the victim.

The victim's mother testified that she called the police on January 14, 2013, because the Defendant had called her mother and asked her mother to find out if the victim's mother would not involve the police if he agreed to leave town. She said that before she went to the police station that day, she had spoken with the Defendant by telephone and told him that she would not "let him get away with hurting" the victim. She said she had not asked him about the victim's allegations in that conversation. She could not recall whether Detective Spangler or Mr. Bishop asked her to make the recorded calls and did not recall whether Detective Spangler instructed her about what she should and should not say. She said, however, that Detective Spangler did not tell her to make any promises or threats to the Defendant. She said she asked him what he did and why he did it because she wanted to know.

In denying the motion to suppress, the trial court made the following factual findings and conclusions of law:

> [The victim's mother] placed a series of telephone calls to the defendant within a very short period of time, to the extent that the calls, although separated by multiple disconnections, were in fact akin to a single encounter. The entirety of the conversation was less than four minutes. During the first call, the defendant immediately answered the first question asked by [the victim's mother] stating that he did it because he was depressed. He then stated he could not "talk right now." The defendant hung up without saying anything else. The courts finds the act of hanging up to be less of a declination to speak about the subject than a desire not to speak about it at that particular time. He started the call by willingly explaining his actions. Only after a specific question did the defendant stop the conversation. [The victim's mother] called again and the defendant immediately hung up without saying anything. This evinces more of a desire not to talk on the phone at that time.
>
> [The victim's mother] called a third time and informed the defendant that he had to speak with her about this subject at this time; that he "owed it to her and her daughter," the alleged victim. The defendant then immediately began to discuss his actions by saying he didn't mean to do it,

-11-

that he gave in and shouldn't have, that [it] was horrible, and that he wished he were dead. After being confronted by [the victim's mother] with a question regarding penetration, the defendant hung up again. Again, it appears that the defendant was willing to discuss the situation in general terms, but did not want to discuss specifics of his actions.

[The victim's mother] then placed three more calls in quick succession. The defendant never answered the phone again. The court finds that the act of not answering the phone a fourth time was the first clear indication that the defendant was unwilling to discuss the situation on the phone at all. It also shows that the defendant knew how to avoid the conversation, if he so desired.

During all of these calls, Detective Spangler was directing [the victim's mother] on what to say. However, she never told [the victim's mother] to make any threats or promises to the defendant. She did tell [the victim's mother] to tell the defendant the he "owed it to her and her daughter" to discuss what happened. At no time, did [the victim's mother] tell the defendant that if he didn't tell her what happened that something bad would happen to him. Nor did she make any promises of leniency in exchange for his confession. [The victim's mother] made the calls in the first place at the request of Detective Spangler. However, [the victim's mother] stated that she was aware the calls were being recorded and consented to making the calls and the recording of the calls.

. . . .

Both parties cite *State v. Ackerman*, 397 S.W.3d 617 (Tenn. Crim. App. 2012), a case that addressed a similar issue. In *Ackerman*, the Tennessee Court of Criminal Appeals found that under those particular facts that a phone call made by a private citizen at the direction of law enforcement overbore the defendant's will such that the citizen became a state actor and that the statements of the defendant were not voluntary. *Id.* at 649. However, the facts in the present case are distinguishable from *Ackerman*. In *Ackerman*, the caller told the defendant that if he did not talk, he would not be allowed to visit his children. In addition to this threat, the caller also offered leniency in the form of a promise that "things would go back to the way they were" if he would just tell what happened. Nothing of the sort occurred in the present case. Here, the closest statement to any form of coercion was that the defendant "owed it to her and her daughter" to tell her what happened and why, and [the victim's mother's] statement that "he had to" speak with her and that he "had no choice." None of these

-12-

statements contain threats or promises. The phrase "owe it" is merely an appeal to the defendant's conscience. [The victim's mother] never said why he "had" to speak with her. The defendant clearly understood that he did have a choice. He stopped answering the phone.

The court finds that the defendant willingly engaged in brief conversations with the [victim's mother]. He demonstrated his understanding and ability to cease the call by hanging up and not answering again. He was willing to give an explanation for his actions and express remorse, although he did not want to speak about specific acts. When he decided to cease speaking to the caller completely, he did so. Thus, the defendant's statements during the two calls in which he spoke were freely and voluntarily given, not extracted by threats or promises, nor by any improper influence or governmental overreach. *See Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 42 L.Ed. 568 (1897). Furthermore, the statements and actions by the caller did not overbear the defendant's will to resist. His statements were freely self-determined. *See State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

Since the court has found that the defendant's statements during the calls were not coerced, it is unnecessary for the court to examine whether or not the caller was a state agent. There is no need to conduct the "legitimate independent motivation" test.

The defendant's motion to suppress the recorded phone calls is denied. Since the last three calls where the defendant never answered the phone merely contain hearsay, they are inadmissible short of a showing of an exception to the hearsay rule by either party.

We begin our analysis by noting that the controlling law relative to police-directed one-party consent calls is found in *State v. Sanders*, 452 S.W.3d 300 (Tenn. 2014), which was decided after the trial court's ruling on the suppression motion and after the Defendant's trial.[1] In *Sanders*, our supreme court said that suspects whose trusted confidant records or transmits their conversations, which the State later relies upon in a criminal prosecution, are afforded no constitutional protection relative to a voluntary statement to the confidant. *See Sanders*, 452 S.W.3d at 314. The key inquiry is not whether the police were somehow involved in the circumstances surrounding the

---

[1] *Sanders* overruled *Ackerman*, which had been relied upon by the trial court, to the extent that *Ackerman* suggests that Fifth Amendment protections apply in "misplaced trust" cases, whereby a suspect makes an incriminating statement to a family member or other trusted individual who, unbeknownst to the suspect, has betrayed the suspect's trust and has secretly recorded communication with the suspect at the behest of law enforcement. *See Sanders*, 452 S.W.3d at 315, n.11.

confidant's procurement of the statement; rather, it is whether the inculpatory statement was made voluntarily. *See id.*

The question of whether a confession was made voluntarily is one of fact. *Id.* at 305; *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The State bears the burden of proving, by a preponderance of the evidence, that a confession was voluntary. *Sanders*, 452 S.W.3d at 305; *State v. Stamper*, 863 S.W.2d 404, 405 (Tenn. 1993).

Generally, a trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). If, however, the trial court based its findings "solely on evidence for which witness credibility is not an issue, appellate courts may review that evidence de novo without presumption of correctness." *Sanders*, 452 S.W.3d at 306; *see State v. Northern*, 262 S.W.3d 741, 748 n.3 (Tenn. 2008); *State v. Payne*, 149 S.W.3d 20, 25 (Tenn. 2004). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Defendant contends that the trial court's factual findings are not based upon matters involving witness credibility and that this court should conduct a de novo review without a presumption of correctness. The State contends that de novo review is inappropriate because the suppression hearing evidence included the testimony of live witnesses. It notes that the evidence in *Sanders* likewise included witness testimony and that the supreme court stated that de novo review of the facts was inappropriate in view of the witnesses' testimony, which pertained to the circumstances surrounding the calls. *See Sanders*, 452 S.W.3d at 306. The situation in the present case is analogous. Detective Spangler and the victim's mother testified at the suppression hearing regarding the circumstances surrounding the calls. We note, as well, that Detective Spangler and the victim's grandmother testified about the circumstances surrounding the calls at the trial. We agree with the State that de novo review unaccompanied by a presumption of correctness is inappropriate in the present case.

Consistent with *Sanders*, constitutional concerns are not in play merely because the Defendant's statements were elicited by the victim's mother at Detective Spangler's direction. *See id.* at 311 ("In cases that involve suspects making confessions to friends, relatives, and other associates, the law need not be concerned with whether that confidant could properly be labeled as a private citizen or an agent of the State."). The Defendant argues that notwithstanding the holding of *Sanders*, the facts of the present case involve more than mere "misplaced trust" and that the calls are "evidence of a systemic way that law enforcement is circumventing constitutional rights of defendants through legal technicalities or 'loopholes.'" He argues that Detective Spangler attempted to overbear the Defendant's will through emotional manipulation and to extract an incriminating statement. He also argues that the totality of the circumstances shows that his statements were involuntary. He posits that the victim's mother's statement that he "had" to talk to her about the victim's allegations was an implicit threat of "negative consequences within his family if he did not speak with her" and that she overbore his will through emotional manipulation and threats.

The State counters the Defendant's argument by noting that despite the victim's mother's multiple calls to the Defendant, the calls only "added up to four minutes of dialogue." It notes that when the victim's mother asked in the first call why the Defendant had done it, the Defendant answered immediately and spontaneously that he had been depressed. The State also points out that the Defendant repeatedly hung up on the victim's mother and that he hung up even when the victim's mother stated he had no choice and owed it to her and her daughter to talk about the allegations. The State argues that the Defendant's behavior during the calls demonstrates that the Defendant knew he had the ability to end the communications and that his statements were voluntarily made.

The evidence shows that the victim's mother repeatedly called the Defendant, that the calls were brief, that the Defendant responded to some inquiries and not to others, and that the Defendant ended some of the calls and then stopped answering his telephone when the victim's mother continued to call. We conclude that the evidence does not preponderate against the trial court's findings that the Defendant willingly participated in conversations with the victim's mother about the topics he chose to address and that he terminated the communications when he desired. The court's findings support its conclusions that the Defendant's statements in the calls were voluntarily made and that the victim's mother did not overbear the Defendant's will to resist and did not coerce him into making the statements. The Defendant is not entitled to relief on this basis.

## II

## Pretrial Determination Regarding Victim's Reliability and Credibility

The Defendant contends that the trial court erred in denying the Defendant's pretrial motions relative to interaction between the victim and State agents and for a

"taint hearing." He contends that the court should have held a pretrial hearing to determine the extent to which the State had met with the victim, the identity of the State agents present at such meetings, the reliability of the victim's testimony, and the victim's competency. The State contends that the court was not required to conduct a taint hearing and that the court did not err in declining to do so. We agree with the State.

The Defendant's argument relies primarily on caselaw from New Jersey, which held that the "use of coercive or highly suggestive interrogation techniques can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements and subsequent testimony concerning such events." *State v. Michaels*, 642 A.2d 1372, 1379 (N.J. 1994). In such circumstances, New Jersey requires a pretrial taint hearing to determine whether improper police or prosecutorial action was suggestive to a degree that it gives rise to "a substantial likelihood of irreparably mistaken or false recollection of material facts bearing on the defendant's guilt." *Id.* at 1382-83. In *Michaels*, the New Jersey Supreme Court held that a criminal defendant bears the burden of demonstrating evidence that a victim's statements resulted from suggestive or coercive interview techniques in order to trigger the necessity of a pretrial taint hearing. *Id.* at 1383. We likewise observe that the facts of *Michaels* involved egregious conduct of State actors. *Id.* at 1379-81.

In the present case, the Defendant notes expert witness testimony in *State v. Dotson*, 450 S.W.3d 1, 39 (Tenn. 2014), *cert. denied*, --- U.S. ---, 135 S. Ct. 1535 (2015), that the passage of time and repeated interviews of a child victim gave rise to concerns about the child's reliability. In *Dotson*, the defendant did not allege a pretrial taint hearing should have occurred; rather, the expert testified as a defense trial witness relative to the question of the victim's reliability. As such, *Dotson* did not address the propriety of pretrial taint hearings in Tennessee.

The Defendant argues, nevertheless, that the trial court erred by denying his motion for a pretrial taint hearing. In denying the Defendant's motions for the hearing, the trial court made the following findings and conclusions:

> The crux of the defendant's position is that the alleged victim has been interviewed by investigators and had the opportunity to discuss her allegations with adult family members. According to the defendant, it is possible that the child would testify based upon statements made to her by other adults rather than from her own personal knowledge of the alleged incidents. The defendant claims that the child's allegations have evolved over time. The State counters that the alleged victim has never changed her story, but has added more details as she was questioned by investigators, as is common among child victims.

-16-

The [Department of Children's Services (DCS)] file was subpoenaed for in camera review. This file has been reviewed by the court, including the forensic interview of the child. The court has been unable to find any entries in the file to indicate that the child has changed her story after conversations with someone else. Furthermore, the file does not contain any apparent *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] material other than a statement by the forensic nurse examiner that the child told her that "his private touched her private" rather than penetrating her. The nurse stated this was consistent with her medical findings and that the child's disclosure to her was consistent with what she told the forensic interviewer. However, there is an indication that the child previously stated that there was penile/vagina penetration. In fact, counts five through seven of the presentment allege penile/vagina penetration. Therefore, the court is ordering the State (if they haven't already done so) to tender to the defendant the recording of the child's statement to the forensic interviewer along with the report from the nurse examiner.

In spite of this potential discrepancy, the court does not find any evidence to believe that the child has been tainted by the statements of any individual. Her allegations appear, on their face, to be based upon her memory of events. In addition, the child appears competent to understand historical events and relate them from her own personal knowledge. Witnesses are presumed competent. *See* TRE Rule 601. The child will be administered an oath to tell the truth pursuant to Rule 603. The court will make the determination at trial if the child can appreciate the solemnity of the oath. The law in the State of Tennessee is that witnesses are presumed to tell the truth. *Lundy v. State*, 752 S.W.2d 98, 103 (Tenn. Crim. App. 1987). This applies to child witnesses as well.

The court is of the opinion that no further pre-trial hearing is necessary in order to determine the competency of the witness or the source of her knowledge of events. The concerns raised by the defendant in his motion can properly be addressed through cross-examination of the witness. Therefore, the defendant's motion is hereby DENIED.

The Defendant has not provided, nor have we found, any Tennessee case supporting a requirement of a pretrial taint hearing.[2]

As the trial court noted in its order, witnesses are presumed to be competent and truthful. By requesting a pretrial taint hearing, the Defendant sought to discover the extent to which State actors had interacted with the victim, the victim's reliability, and her competency. The trial court had the benefit of the parties' arguments relative to the facts of the case and the question of whether a taint hearing should be conducted, and the court reviewed in camera the relevant DCS file. In denying the motion for a pretrial taint hearing, the court determined that no evidence indicated taint of the victim by State actors, that nothing showed the victim was a less than competent witness, and that the opportunity to assess the victim's understanding of the oath to tell the truth would be provided upon the victim's taking the oath at trial. The court likewise noted that witnesses were presumed to tell the truth. Upon review, we conclude that no Tennessee precedent exists to support a requirement that a trial court conduct a pretrial taint hearing.[3]

In his brief, the Defendant complains that "it is impossible to discern the number of times that [the victim] met with the prosecutors or other State agents, as well as the number of times she discussed her allegations with her family members, because the trial court refused to limit her access and refused to compel the State to identify the number of meetings that had occurred." He argues that a passage of time occurred between the victim's pretrial forensic interview and her trial testimony, that she may have communicated with family members in this time, and that she "seemed willing to agree to whatever question was asked of her." He argues that a pretrial taint hearing would have

---

[2] We note that most other jurisdictions reject the *Michaels* decision upon which the Defendant relies. *See, e.g.*, *State v. Michael H.*, 970 A.2d 113, 121 (Conn. 2009) (noting majority rule); *e.g., People v. Montoya*, 57 Ca. Rptr. 3d 770, 778 (2007); *State v. Karleas*, 28 So. 3d 913, 915 (Fla. 2010); *State v. Ruiz*, 150 P.3d 1003, 1008-09 (N.M. 2006); *State v. Olah*, 767 N.E.2d 755, 760 (Ohio 2001). Even in jurisdictions that have not rejected *Michaels* out of hand, courts have not embraced the need for a pretrial taint hearing. *See Commonweath v. Delbridge*, 855 A.2d 27, 39-40 (Pa. 2003) (holding that the question of taint was an appropriate inquiry at a competency hearing, rather than a separate pretrial taint hearing); *English v. State*, 982 P.2d 139, 146-47 (Wyo. 1999) (declining to adopt a requirement of a pretrial taint hearing and holding that concerns could be addressed adequately at a competency hearing upon a showing by a party that a child witness is incompetent).

[3] Even under the *Michaels* approach that the Defendant advocates, he failed to demonstrate any facts that suggested improper police or prosecutorial action to a degree that showed "a substantial likelihood of irreparably mistaken or false recollection of material facts bearing on the defendant's guilt." *See Michaels*, 642 A.2d at 1382-83. As the trial court noted, witnesses are presumed to tell the truth. *See Lundy*, 752 S.W.2d at 103; *State v. Glebock*, 616 S.W.2d 897, 903 (Tenn. Crim. App. 1981). Further, the record reflects that the court questioned the victim about her understanding of telling the truth and the importance of testifying truthfully. The Defendant was afforded the opportunity to challenge the victim's credibility by cross-examining her at the trial about the statements she made in the forensic interview.

allowed him to litigate whether coercive or suggestive pretrial interview techniques had been employed. We note, however, that even under the *Michaels* approach advocated by the Defendant, the pretrial taint hearing is not a discovery mechanism.

The trial court did not err in denying the Defendant's motion for a pretrial taint hearing. He is not entitled to relief on this basis.

## III

## Lack of Pretrial Hearing Regarding Corroboration of the Reliability of the Defendant's Pretrial Statements

The Defendant contends that the trial court erred in failing to conduct a pretrial hearing to corroborate the reliability of the Defendant's pretrial statements pursuant to the requirements of *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014). He contends that the evidence was insufficient to corroborate his pretrial statements, which were admitted at the trial. The State contends that the Defendant waived consideration of this issue by failing to request the hearing and that, in any event, the trial testimony of the victim and the Defendant's adoption of his pretrial statements provided adequate corroboration of the trustworthiness of the pretrial statements. We agree with the State that the Defendant waived any complaint about the lack of a pretrial hearing, and we consider his issue regarding sufficient corroboration as a component of our sufficiency of the evidence analysis.

The evidence which the Defendant claims was admitted without adequate corroboration consists of the telephone calls between himself and the victim's mother. He acknowledges that the admissibility was not addressed in a pretrial ruling and, as the State notes, the Defendant failed to seek a pretrial ruling in this regard. The Defendant contends, however, that this court should "direct a judgment of acquittal upon a finding that evidence is legally insufficient to support a conviction." The Defendant has raised two distinct issues: whether the trial court erred in failing to conduct a pretrial hearing and whether the court erred in admitting his pretrial statements at the trial. To the extent that the Defendant alleges that he was deprived of a pretrial ruling, we note that he filed motions to suppress his pretrial statements alleging that the statements were irrelevant and involuntary. The trial court denied the motions to suppress. The record fails to reflect that the Defendant requested a pretrial hearing regarding the adequacy of other evidence to corroborate the statements pursuant to *Bishop*. Likewise, he has failed to demonstrate that the trial court was required, *sua sponte*, to make a pretrial determination. *Cf. id.* at 62 (noting that the appellate court's review would be limited to the evidence raised at the trial because the corroboration issue had not been litigated before the trial). The Defendant has waived any complaint relative to the lack of a pretrial ruling. *See* T.R.A.P. 36(a) (stating that nothing in the rule permitting appellate relief to an aggrieved

party shall be construed to require relief if the party failed to take reasonably available action to prevent or nullify the harmful effect of an error).

Because it involves the sufficiency of the evidence to support the conviction, the question of whether the Defendant's pretrial statements were adequately corroborated at the trial, however, is not waived. We will consider this issue below as a component of our overall review of the sufficiency of the evidence.

## IV & V

## Denial of Motions for a Directed Verdict and for Judgment of Acquittal and Review of Sufficiency of the Evidence

In related issues, the Defendant contends that the court erred in denying the motions for a directed verdict and for judgment of acquittal and that the evidence is insufficient to support the convictions. The State contends that the evidence is sufficient. We agree with the State.

"The duty of the trial judge and the reviewing court on the determination of a motion for a judgment of acquittal is the same as on a motion for a directed verdict." *State v. Thomas*, 158 S.W.3d 361, 386-87 (Tenn. 2005). Similarly, the standard of review for a trial court's denial of a motion for a judgment of acquittal is the same as the "standard that applies on appeal in determining the sufficiency of the evidence[.]" *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). "A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn 2009)).

## A.  Rape of A Child – Defendant's Bed

We consider, first, the Defendant's conviction of rape of a child for the vaginal/oral penetration occurring at the Defendant's house on his bed.  Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age."  T.C.A. § 39-13-522(a) (2014).  Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]"  T.C.A. § 39-13-501(7) (2010) (amended 2013).  Our supreme court has held that "[t]here is . . . 'sexual penetration' in a legal sense if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male.  It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient."  *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting *Hart v. State*, 21 S.W.3d 901, 905 (Tenn. 2000)).

Viewed in the light most favorable to the State, the proof shows that as the victim watched television in the Defendant's bedroom, the Defendant entered the room, went under the sheets, and touched her "private" with his mouth.  When asked by the victim's mother in a telephone call why he had done what the victim alleged, the Defendant stated that he had not meant to, that he gave in but should not have, that he was depressed, that he did not know why he did it, that it was horrible, and that he wished he were dead.  The victim's grandmother testified that she spoke with the Defendant by telephone and that when she asked why he had done it, he stated that he did not know, that he had been depressed, that he was sorry, and that if the victim's family did not notify the police, he would leave town and they would never see him again.  She also said he stated that he would rather die than go to jail, that he put his house on the market, and that he left town within three weeks to one month and was located in Michigan after having lived in Tennessee for thirty-three years.

The Defendant argues that he was convicted based upon the uncorroborated testimony of a nine-year-old child.  However, a sexual offense may be proven by the uncorroborated testimony of a child victim.  *See State v. Collier*, 411 S.W.3d 886, 899 (Tenn. 2013) (rejecting the argument that a victim could be an accomplice to the offense of aggravated statutory rape and concluding that the evidence was sufficient to sustain the convictions based upon the victim's uncorroborated testimony).

The Defendant argues that, despite the victim's testimony that the Defendant touched her private with his mouth, the proof is insufficient because the victim testified that the Defendant never put anything inside her.  Cunnilingus is included in the statutory definition of sexual penetration.  *Id.* § 39-13-501(7).  In this sense, proof of cunnilingus is proof of sexual penetration, and additional proof of penetration of the vagina is not

required. *See, e.g.*, *State v. Hoyt*, 928 S.W.2d 935, 942 (Tenn. Crim. App. 1994), *overruled on other grounds by State v. Spicer*, 12 S.W.3d 438, 447, n.12 (Tenn. 2000); *State v. Alec Joseph Mesot*, No. M2006-02599-CCA-R3-CD, 2008 WL 732151, at *5-6 (Tenn. Crim. App. Mar. 14, 2008).

We conclude that the evidence is sufficient to support the conviction for this count. The Defendant is not entitled to relief on this basis.

## B. <u>Rape of A Child – Defendant's Couch</u>

Next, we consider the conviction for vaginal/oral penetration occurring on the couch in the Defendant's living room. Viewed in the light most favorable to the State, the evidence shows that as the victim napped on the couch, the Defendant came to the couch where she was sitting and that he touched her private with his finger and his mouth. As we have detailed previously, when the Defendant was asked in telephone calls with the victim's mother and the victim's grandmother, he made inculpatory statements.

In so holding, we have not overlooked the Defendant's argument that he was convicted of rape of a child occurring at his house, whereas the Amended Bill of Particulars alleged that the offense occurred at the victim's house. The Defendant is correct that the Amended Bill of Particulars alleged this occurred at the victim's house. At the trial, the parties proceeded on this count as having occurred at the Defendant's house, and the Defendant did not object on the basis of variance from the Amended Bill of Particulars. During the charge conference, the court asked if defense counsel had any objections to its proposed jury instructions, which included discussion of the election of offenses and the corresponding instructions, and counsel said she had none. The Defendant did not raise a variance issue in the motion for a new trial, although defense counsel argued at the motion for a new trial that the evidence for Count 2 was insufficient because the Amended Bill of Particulars alleged that the offense occurred at the victim's home, but the proof showed that it occurred on the living room couch at the Defendant's home. Defense counsel also alleged orally at the motion for a new trial that the defense had been unable to prepare for trial based upon the wording of the Amended Bill of Particulars with respect to Count 2. The trial court rejected the Defendant's arguments, stating that no fatal variance existed between the Amended Bill of Particulars and the proof. The court noted, "the defense was given ample opportunity to cross-examine the child and bring up evidence of inconsistencies through that[.]"

A variance between an indictment or bill of particulars and the trial evidence is fatal only if it is both material and prejudicial. *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000); *See State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984); *State v. Osborne*, 251 S.W.3d 1, 15 (Tenn. Crim. App. 2007); *State v. Ealey*, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997). When the proof and the indictment substantially

correspond, a variance is not material because the defendant could not have been misled at the trial and is protected from a second prosecution. *Moss*, 662 S.W.2d at 592; *see, e.g.*, *Shropshire*, 45 S.W.3d at 71 (no fatal variance existed where bill of particulars specified that the defendant forced the victim to touch his penis with her mouth but trial proof showed that he forced her to touch his penis with her hand). "A material variance occurs only if the prosecutor has attempted to rely upon theories and evidence at the trial that were not fairly embraced in the allegations made in the charging instrument." *State v. Mayes*, 854 S.W.2d 638, 640 (Tenn. 1993) (citing *Russell v. United States*, 369 U.S. 749, 791-93 (1935) (Harlan, J., dissenting).

This court addressed facts similar to those in the present case in *State v. Henry Floyd Sanders*, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545, at *13 (Tenn. Crim. App. Oct. 9, 2012), *aff'd on other grounds*, 452 S.W.3d 300 (Tenn. 2014). In *Henry Floyd Sanders*, the bill of particulars alleged offenses occurring at a home at one address, but the victim testified at the trial that the offenses occurred at a home at a different address and at the defendant's apartment. In holding that the variance was not material and did not prejudice the defendant, the court stated that it was sensitive to the reality that young child sexual abuse victims may be unable to testify to abuse on a specific date or to provide extensive details. *Henry Floyd Sanders*, 2012 WL 4841545, at *13. The court noted that the State narrowed the timeframe of the offenses to dates during which the defendant lived at both residences the victim identified as locations of the offenses. *Id.* In any event, this court has said that the location of the offense is not an element of the crime of rape of a child. *Cf. State v. Joshua Paul Lewis*, No. E2014-00918-CCA-R3-CD, 2015 WL 795856, at *9 (Tenn. Crim. App. Feb. 25, 2015) (bill of particulars alleged the offense occurred at "Cumberland Mountain State Park in Cumberland County," but trial proof showed that the offense occurred at a "state park in Crossville").

In the present case, the Amended Bill of Particulars notified the Defendant of the conduct alleged relative to Count 2 and, although the proof at the trial varied in that it showed the offense occurred in a different location than alleged in the Amended Bill of Particulars, the record reflects that the Defendant was aware throughout the trial that the State sought conviction for Count 2 based upon rape of a child involving oral/vaginal penetration occurring at his home. He has not shown a fatal variance, and he is not entitled to relief on this basis.

## C. Aggravated Sexual Battery

We turn to the Defendant's conviction for aggravated sexual battery for vaginal/digital contact in the movie room of the victim's old house. Aggravated sexual battery is defined, in relevant part, as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when] [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). Sexual contact, in relevant part, is "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the

clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id.* § 39-13-501(6) (2010) (amended 2013). Intimate parts are "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id.* at (2).

The evidence, viewed in the light most favorable to the State, reflects the victim's testimony that when she was in the movie room at her old house, the Defendant unzipped her pajamas and touched her private with his finger. She said his finger did not go inside her. As we have noted, the Defendant made inculpatory statements relative to the victim's allegations of sexual abuse in telephone calls with the victim's mother and the victim's grandmother.

The Defendant argues that the State failed to prove that the Defendant intentionally touched the victim for the purpose of sexual gratification. The Defendant's statements that he should not have done it, that he regretted it, and that he was a horrible person support the jury's determination that he acted intentionally and that he touched the victim for the purpose of sexual gratification.

We have also considered the Defendant's argument that the evidence is insufficient to show that the offense occurred in the family room of the victim's house as specified in the Amended Bill of Particulars. The Defendant is correct that the proof varied from the facts alleged in the Amended Bill of Particulars. As with rape of a child, the location in which aggravated sexual battery occurs is not an element of the crime. *See id.* § 39-13-504(a)(4); *cf. Joshua Paul Lewis*, 2015 WL 795856, at *9. The record fails to reflect that the variance was fatal to the defense. *See Henry Floyd Sanders*, 2012 WL 4841545, at *13.

The evidence is sufficient to support the conviction for this count. The Defendant is not entitled to relief on this basis.

### D. <u>Corroboration of the Defendant's Statements</u>

In evaluating the sufficiency of the evidence to support the convictions, we have considered the Defendant's argument that the evidence was insufficient to support the convictions because the State failed to offer corroboration of his inculpatory pretrial statements.

"A conviction cannot be based solely on a defendant's confession and, therefore, . . . the State must present some corroborating evidence to establish the *corpus delicti*[.]" *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000)). "*Corpus delicti* is the body of the crime—evidence that a crime was committed at the place alleged in the indictment." *Van Zandt v. State*, 402 S.W.2d 130,

136 (Tenn. 1996).  "A confession may sustain a conviction where there is other evidence sufficient to show the commission of the crime by someone." *Taylor v. State*, 479 S.W.2d 659, 661-62 (Tenn. Crim. App. 1972).

In *Bishop*, 431 S.W.3d 22, our supreme court adopted the modified trustworthiness standard for corroboration of a confession, whereby "a defendant's extrajudicial confession is sufficient to support a conviction only if the State introduces 'independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury.'" *Bishop*, 431 S.W.3d at 58 (quoting *State v. Lucas*, 152 S.2d 50, 60 (N.J. 1959)). In other words, if the offense involves tangible injury, the prosecution "must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred." *Id.* at 59.  If, however, the offense does not involve a tangible injury, the prosecution "must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime." *Id.*  The court noted that offenses that do not involve a tangible injury "may include inchoate crimes, certain financial crimes, status crimes, and sex offenses lacking physical evidence and a victim who can testify." *Id.* at n.28.  The substantial independent evidence "must corroborate essential facts contained in the defendant's statement," regardless of whether a tangible injury occurred, and evidence corroborating "collateral circumstances surrounding the confession will not suffice to establish trustworthiness." *Id*. at 59-60.  In the case of a sex offense that lacks proof of physical evidence but involves a testifying victim, the standard for tangible injury crimes applies. *State v. Frausto*, 463 S.W.3d 469, 480 (Tenn. 2015) (citing *State v. Clark*, 452 S.W.3d 268, 280 (Tenn. 2014).

Our supreme court has said, "The question of whether an extrajudicial confession is adequately corroborated is a mixed question of law and fact that appellate courts will review de novo.  To the extent that the corroboration challenge rests on disputed facts, appellate courts should presume that the trial court's resolution of factual disputes is correct, unless the evidence preponderates against those findings." *Bishop*, 431 S.W.3d at 61.

In the present case, the Defendant's inculpatory statements were corroborated by the victim's testimony and the Defendant's testimony.  The victim testified that the Defendant committed the offenses, and the Defendant testified that he made the statements on the recordings of the calls.  The Defendant offered his explanation of the statements, and the jury had the opportunity to evaluate his credibility in this regard.  Substantial independent evidence corroborated the Defendant's statements in the calls.  The victim's testimony also provides prima facie evidence of actual injury.

The evidence is sufficient to support the Defendant's convictions for two counts of rape of a child and one count of aggravated sexual battery. He is not entitled to relief on this basis.

## VI

## References to "Count 8"

The Defendant contends that he is entitled to a new trial because the trial court and the prosecutor referred to "Count 8" during the trial, despite the fact that only three counts were submitted to the jury. He argues that the references suggested he had committed other crimes or bad acts. The State contends that the Defendant did not suffer prejudicial error relative to the trial court's actions and that the Defendant waived any complaint about the State's references during rebuttal argument by failing to object. We agree with the State.

Before the trial began, the trial court dismissed four counts of the indictment and instructed the State to refer to Count 8 as the "next count" when reading the indictment. At the time, Count 8 would have been the fifth count read to the jury. The court stated that it did not want the jury to speculate about the reason that some counts were not being submitted for the jury's consideration. Following the State's proof, the court granted the motion for judgment of acquittal with respect to two charges, and ultimately, Counts 1, 2, and 8 were submitted to the jury. After having referred initially to the "third count" in its closing argument, the prosecutor identified Count 8 in his rebuttal argument as follows: "Count 3 is aggravated – or count 8, I think, is actually what it is . . ., but the third count you guys are going to do is aggravated sexual battery." The jury instructions and verdict forms reflect, as well, that the count charging aggravated sexual battery is designated as the "8th count."

## A. Jury Instructions

We consider first the Defendant's argument that the trial court erred by not renumbering Count 8 in the jury instructions and on the verdict form.

A criminal defendant has "a right to a correct and complete charge of the law." *State v. Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 390); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34.

The Tennessee Constitution states, "The Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." Tenn. Const. Art. VI, § 9. Our supreme court has cautioned that a trial judge "must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 406-07 (Tenn. 1989).

In the present case, the Defendant argues that the jury instructions were prejudicial because they suggested that he committed additional acts for which he was not on trial. We note that the jury was aware the Defendant was charged with at least five counts because as many were announced at the beginning of the trial. The jury was, likewise, aware that only three counts were submitted for its consideration at the close of the proof. Although the record does not reflect why the trial judge used the "8th Count" terminology after having previously instructed the State to refer to it as the "next count," nothing in the record suggests that the Defendant was prejudiced when the court referred to Count 8 in its jury instructions and on the verdict form. The number of counts submitted for the jury's consideration corresponded with the proof, and the record does not reflect that the numbering of the counts was a focus for the jury or was emphasized in the instructions or on the verdict forms. Likewise, with respect to Article VI, section 6 concerns, the record does not support a conclusion that the court's jury instructions misstated the law or charged the jury on matters of fact.

We have not overlooked the Defendant's argument that evidence of prior crimes or bad acts are generally only admissible pursuant to the procedure specified in Tennessee Rule of Evidence 404(b). The judge's instructions and the verdict form were not evidence. Rule 404(b) is inapplicable. We conclude that the Defendant is not entitled to relief on the basis that the trial court did not renumber Count 8 in the jury instructions and the verdict form.

## B. **Rebuttal Argument**

We turn to the Defendant's argument related to the State's reference to Count 8 during its rebuttal argument. He claims that the reference, along with argument about the victim's description of finding "something in her panties like a booger" and about her knowledge of sexual matters as having come from the Defendant, implied that additional counts existed but were not submitted.

The State argues that the Defendant has waived any objection to its rebuttal argument referring to Count 8 by failing to make a contemporaneous objection at the trial. The failure to object during the argument results in waiver of the issue. *See State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992); *see also* T.R.A.P. 36(a) (stating "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to

prevent or nullify the harmful effect of an error"). Our review is limited to determining whether the Defendant is entitled to plain error relief.

To that end, we have considered the relevant law regarding plain error review, the permissible parameters of closing argument, and prosecutorial misconduct. *See, e.g.*, *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001) (closing argument); *Smith*, 24 S.W.3d at 282 (plain error); *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (closing argument and prosecutorial misconduct). We conclude that the Defendant has not demonstrated that plain error relief is required. He is not entitled to relief on this basis.

## VII

The Defendant contends that the trial court erroneously instructed the jury that aggravated sexual battery required an intentional, knowing, or reckless *mens rea*, contrary to our supreme court's holding in *Clark*, 452 S.W.3d at 295, that the *actus reus* of the offense – "touching" of another's intimate parts – must be done intentionally. The State contends that the instruction was proper and, that even if the instruction was erroneous, the error was harmless. Insofar as the Defendant contends that the court gave an erroneous instruction as to aggravated sexual battery in Count 8, we agree, and we reverse the conviction and remand for a new trial on that count. We conclude, however, that the Defendant is not entitled to relief relative to the aggravated sexual battery instruction as specified as a lesser included of rape of a child in Counts 1 and 2.

The aggravated sexual battery instruction given at the Defendant's trial states:

Any person who commits the offense of Aggravated Sexual Battery is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant had unlawful sexual contact with the alleged victim in which the defendant intentionally touched the alleged victim's intimate parts, or the clothing covering the immediate area of the alleged victim's intimate parts;

*As to this count, the incident alleged was described as happening in the movie room on a couch in the alleged victim's old house.*

and

-28-

(2)  that the alleged victim was less than thirteen (13) years of age;

and

(3)  that the defendant acted either intentionally, knowingly or recklessly.

If you have a reasonable doubt as to the defendant's guilt of Aggravated Sexual Battery as charged in the eighth count of this presentment, then your verdict must be not guilty as to this offense and then you shall proceed to determine his guilt or innocence of Assault, a lesser included offense.  Any person who commits an assault upon another is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1)  that the defendant caused physical contact with another;

> *Again, the incident alleged in this count is described on the previous page.*

and

(2)   that a reasonable person would regard the contact as extremely offensive or provocative;

and

(3)  that the defendant acted intentionally or knowingly.

The instructions in *Clark* and in the present case are virtually identical.  In *Clark*, the court observed that the instruction, as written, "created a potential for juror confusion" relative to the requirement that the "sexual contact" element must consist of intentional touching and could not consist merely of knowing or reckless touching.  *See id.* at 298.  The *Clark* court stopped short of holding that the instruction was erroneous, however, because it determined that any error would have been harmless beyond a reasonable doubt in view of the State's theory that the defendant's conduct had been intentional, not knowing or reckless, and as such, the jury "had no occasion to consider these lesser mental states in regard to the *actus reus* of aggravated sexual battery."  *See*

-29-

*id.* at 299. The court encouraged trial courts and the Committee on Pattern Jury Instructions "to pursue greater precision in explaining the mental states that apply to the separate elements of aggravated sexual battery." *See id.* The court specified:

> Instead of including reckless, knowing, and intentional at the end of the jury instruction as the trial court did in this case, future courts should specify that (1) unlawful sexual contact means intentional touching of the intimate parts or the clothing immediately covering the intimate parts, and that this intentional touching must be reasonably construed as being for the purpose of sexual arousal or gratification; and (2) that the victim was less than thirteen years old, and the defendant acted recklessly, knowingly, or intentionally regarding this fact.

*Id.*

In the present case, the State's theory was that the Defendant's actions were intentional relative to the aggravated sexual battery. However, the proof included evidence that the Defendant stated in one of the recorded telephone calls that he "didn't mean to do it." He also stated that he gave in but should not have and that he had been depressed. This evidence, particularly the Defendant's statement that he "didn't mean to do it," might provide a basis that could support a conclusion that the sexual contact was committed knowingly or recklessly, rather than intentionally. The Defendant testified that he did not commit the offenses. However, even if a jury discredited the Defendant's testimony that he did not commit the offenses, it could nevertheless credit his pretrial statement that he "didn't mean to do it" and conclude that the State failed to prove that the sexual contact was committed intentionally but that the proof showed the sexual contact was knowing or reckless. Thus, we cannot avoid the question of whether the jury instruction was erroneous by concluding that any error would be harmless beyond a reasonable doubt. *Cf. id.*

In *Clark*, our supreme court observed the following:

> Determining whether this instruction is erroneous is a close call. Despite the ambiguity, a jury which read these instructions carefully would likely determine that the "sexual contact" element had to be done "intentionally," regardless of the potentially confusing placement of element (3) of the trial court's jury instructions. Because the words "intentionally touched" occur in close proximity to "unlawful sexual contact" in element (1), a reasonable jury would probably interpret this to mean that the more specific mens rea of "intentionally" had to apply to the touching/sexual contact, while the broader mental states contained in element (3) applied to all other aspects of the crime.

Nevertheless, the supreme court expressed its misgivings about the pattern instruction and considered the possibility the jury might have misunderstood the instructions and rested its holding on the fact that even if such misunderstanding occurred, it would not have prejudiced the defendant because the facts could not support a conclusion that the defendant's conduct had been less than intentional. We note that the pattern instruction has been revised post-*Clark*. *See* 7 Tenn. Pract., T.P.I.—Crim. § 10.03 (2016). We note, as well, that in reversing an aggravated sexual battery conviction on other grounds, the supreme court ordered that the jury instructions at the new trial comply with *Clark*. *See* *Frausto*, 463 S.W.3d at 487.

The supreme court's decision in *Clark* occurred after the trial in the present case, and the Defendant raised the instructional error issue in the motion for a new trial. The trial court acknowledged the *Clark* decision but held that the instruction was proper. As we have noted, neither *Clark* nor *Frausto* addressed directly the question of whether the instruction was per se erroneous.

Upon review of the instruction in connection with the facts of this case, we conclude that the instruction was erroneous at the Defendant's trial. Our decision is based upon language of the instruction as applied to the particular facts of this case, and we reach no conclusion about the instruction's viability in other factual scenarios. Here, however, the imprecision of the instruction coupled with the Defendant's statements created the possibility that the jury found the Defendant guilty of aggravated sexual battery without having determined that his sexual contact with the victim was intentional. We also conclude that the error was not harmless based upon the evidence presented. As such, we must reverse the aggravated sexual battery conviction and remand the case for a new trial on Count 8.

Despite this holding, we do not agree with the Defendant that the rape of a child convictions must likewise be reversed and remanded for a new trial. The Defendant argues summarily in his brief that the rape of a child convictions are infirm because the same aggravated sexual battery instruction was given relative to that offense as a lesser included offense of rape of a child. The record reflects that the jury was instructed to consider the offenses and the lesser included offenses sequentially. To that end, it was instructed to consider first the charged offense and, if it found the Defendant guilty beyond a reasonable doubt, it should return a verdict of guilty on the charged offense. Alternatively, the jury was instructed that if they unanimously found that the Defendant was not guilty of the charged offense or if it had a reasonable doubt as to the Defendant's guilt of the charged offense, it should proceed to consider whether he was guilty of the next lesser included offense. The jury's verdicts of guilty of the two counts of rape of a child indicate its determination, in both instances, that it found the Defendant guilty of the charged offenses. Thus, the jury never proceeded to consider lesser included offenses. As such, consideration of whether the aggravated sexual battery instruction was

erroneous as to these two counts is unnecessary because any error would necessarily be harmless beyond a reasonable doubt. *See Clark*, 452 S.W.3d at 299.

In summary, we reverse the aggravated sexual battery conviction in Count 8 and remand for a new trial at which an instruction that comports with *Clark* is utilized. However, the Defendant is not entitled to relief on Counts 1 and 2 relative to alleged instructional error pertaining to the aggravated sexual battery instruction as a lesser included offense of rape of a child.

## VIII

## Sentencing

The Defendant contends that he was excessively sentenced to ten years for aggravated sexual battery and to an effective sentence of fifty years for all of the offenses. The State contends that the sentences were proper. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859

(Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed," and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing, the victim's mother read an impact statement she had written. It stated that because the Defendant had threatened the victim's mother's and the victim's lives, the victim still would not talk to the victim's mother about everything the Defendant had done. The victim had nightmares for months and had emotional breakdowns and behavioral issues at school. The victim had bathroom accidents at school. The victim was afraid to sleep alone. The victim had "uncontrollable emotional breakdowns" in which she would cry, scream, and rock herself for as long as an hour. The victim's mother said the victim attended counseling sessions for several months and continued to receive counseling when necessary. She said the victim had phases when she did not want to go to counseling because she did not want to think about the abuse. The victim's mother said that in addition to the difficulties the victim encountered as a participant in the legal process, the Defendant blew kisses to the victim in the courtroom on two occasions. The victim's mother said the victim's older brother had anger issues and felt responsible because he had not been able to protect the victim. She said she felt guilty she had not noticed warning signs that the Defendant had been abusing the victim. The victim's mother said that despite everything the victim had endured, the victim smiled and cared about others. The victim's mother said that all the victim had wanted was an apology from the Defendant.

The court received two exhibits: the presentence investigation report and a psycho-sexual evaluation report. The presentence investigation report reflects that the Defendant, who was sixty-three years old at the time of the sentencing hearing, was a high school graduate and had been self-employed as a house painter for thirty years. He reported good mental health, a hernia, and "dizzy spells." He did not submit a statement about the offenses. The victim impact statement that was read at the sentencing hearing was attached as an addendum to the presentence report. In the psycho-sexual evaluation report, the preparer stated that the Defendant obtained varied results on tests designed to measure his risk for reoffending. Scores on three tests indicated moderate risk, while the score on another test indicated a low risk. The preparer stated, "[I]t is difficult to get a good reading of his level of risk," but opined that he was at moderate risk to reoffend. She noted that probation was not an option for the Defendant's convictions and recommended that he participate in "sex offender specific group treatment" after he had served his sentence.

## A. **Aggravated Sexual Battery Sentence**

We consider, first, the Defendant's argument that the trial court erred in sentencing him to ten years for aggravated sexual battery. He claims that in enhancing the sentence above the eight-year minimum, the trial court relied upon an inapplicable enhancement factor, the abuse of private trust. *See* T.C.A. § 40-35-114(14) (Supp. 2012) (amended 2015, 2016). Although we have reversed this conviction due to instructional error and have remanded the case for a new trial on the aggravated sexual battery count, we will review the issue presented in order to provide guidance in the event the Defendant is convicted at a new trial.

At the sentencing hearing, the trial court found relative to the length of the aggravated sexual battery sentence:

> The key in this—certainly, this is a position of private trust. The question is . . . did he use it in a way that significantly facilitated his perpetration of these offenses, and I think he did. The victim was left alone with Mr. Love because in that position of trust that he stood in as a familial—a great-grandfather, and so that allowed him to be alone with this child, and he used that to commit these acts. So I think enhancement factor 14 does apply, and I think it is entitled to a good deal of weight.
>
> . . . .
>
> I believe that because of the abuse of the position of public and private trust—or private trust in this particular case that a sentence above the minimum is warranted.

The Defendant argues that the proof is insufficient to support the aggravated sexual battery conviction and that it, likewise, does not support the proof of the abuse of private trust enhancement factor. Alternatively, he argues that the minimum sentence of eight years is appropriate.

Upon review, we conclude that the trial court did not abuse its discretion in finding that factor (14) applied. The proof showed that the Defendant was the victim's step-great-grandfather. The victim testified that she had spent a lot of time with the Defendant and visited frequently at his house. She spent the night at his house on occasion. The court did not err in applying this factor to the aggravated sexual battery sentence.

## B. **Consecutive Sentences**

We turn to the Defendant's challenge to consecutive sentencing. He argues that the trial court erred in imposing the twenty-five-year sentences for each of the two rape of a child convictions consecutively. As with individual sentencing determinations, the standard of review for the imposition of consecutive sentences is abuse of discretion with a presumption of reasonableness. *Pollard*, 432 S.W.3d at 859. A trial court has broad discretion in determining whether to impose consecutive service. *Id.* A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one of the criterion in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014) is satisfied. In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed," and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4); *see Desirey*, 909 S.W.2d at 33.

The trial court based its consecutive sentencing decision on the factor that may be applied to a defendant who

> is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of [the] defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

T.C.A. § 40-35-115(b)(5). In applying this factor, the court stated that evidence existed to support consecutive sentencing. The court noted, specifically, "the significant mental damage that has been done to this very young child and the destruction of the relationship in this family." The court found, however, that imposition of all three sentences consecutively "would not reasonably relate to the circumstances of this particular case." It likewise observed that the imposition of sentences above the minimum within the respective ranges combined with consecutive sentencing "would not reasonably relate to the aggregate sentence, the reasonableness of this offense." We note that the twenty-five-year sentences imposed for the rape of a child convictions were the minimum sentences for the offense. *See id.* § 39-13-522(b)(1) (2014) (designating rape of a child as a Class A felony), 30-13-522(b)(2)(A) (stating that no person convicted of rape of a child shall be sentenced to less than Range II), 40-35-111(b)(1) (2014) (providing a sentencing range of fifteen to sixty years for a Class A felony), 40-35-112(b)(1) (2014) (providing a sentencing range of twenty-five to forty years for Range II offenders convicted of Class A felonies).

The Defendant, who was sixty-three years old at the time of sentencing, argues that a fifty-year sentence to be served at 100% is, in effect, a life sentence. He analogizes

his case to *State v. Biggs*, 482 S.W.3d 923, 927-28 (Tenn. Crim. App. 2015), in which the defendant was convicted of four counts of aggravated robbery, two counts of theft by shoplifting, and one count of attempted aggravated robbery, and received an effective forty-four-year sentence. The trial court based its consecutive sentencing decision upon a finding that the Defendant's record of criminal activity was extensive. *See* T.C.A. § 40-35-115(b)(2). A majority of this court noted the circumstances of the offenses involved a toy gun, no injuries, and knowledge by two victims that the gun was a toy. It also noted the Defendant's age of forty-nine and his past criminal history did not involve violent offenses. The majority concluded that an effective sentence of forty-four years to be served at 85% was essentially a life sentence and was undeserved "in relation to the seriousness of the offense." *See id.* § 40-35-102. It likewise concluded that the sentence was not the "least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103. The majority noted, as well, that the defendant was already serving a twelve-year sentence and that with the modified sentence, he would be confined until age seventy. In a dissenting opinion, Presiding Judge Woodall stated that, in his opinion, the appellate court was constrained by the abuse of discretion standard of review to affirm the trial court's sentencing determination as long as the trial court had made detailed findings of fact and had conducted an analysis pursuant to the purposes and principles of the sentencing act. Presiding Judge Woodall noted that the majority did not take issue with the trial court's findings of fact and merely disagreed with the application of law to the facts. As such, he would have affirmed the judgments of the trial court. *Biggs*, 482 S.W.3d at 927-29.

We are unpersuaded by the Defendant's reliance on *Biggs*. We consider the cases to be incomparable. The offenses in *Biggs* did not involve injury, whereas the Defendant in the present case repeatedly targeted his young step-great-granddaughter for sexual abuse. The effects the Defendant's conduct had on the victim were significant. Our scope of review is limited by the abuse of discretion standard, and the trial court noted its consideration of relevant purposes and principles of sentencing. We conclude that the evidence supports the trial court's factual determinations and that the court did not abuse its discretion in imposing partially consecutive sentences. The Defendant is not entitled to relief on this basis.

## IX

## **Cumulative Error**

The Defendant contends that due process compels that he receive a new trial because of the existence of cumulative error. The concept of cumulative error is that multiple errors, though harmless, cumulatively violate a defendant's right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). We have found but one error – pertaining to the jury instructions relative to the aggravated sexual battery count – for

which we have reversed the conviction and ordered a new trial. With only one error, multiple errors do not exist to accumulate. The Defendant is not entitled to relief on the basis of cumulative error.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed as to the rape of a child convictions. The judgment of the trial court is reversed as to the aggravated sexual battery conviction, and the case is remanded for a new trial on that count.

_____
ROBERT H. MONTGOMERY, JR., JUDGE